# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**CHARLES SIBLEY**                                        **CIVIL ACTION**

**VERSUS**                                                **NO: 11-0351-HGB-SS**

**MICHAEL J. ASTRUE, COMMISSIONER**
**OF SOCIAL SECURITY ADMINISTRATION**

## REPORT AND RECOMMENDATION

The plaintiff, Charles Sibley ("Sibley"), seeks judicial review, pursuant to Section 405(g)
of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social
Security Administration (the "Commissioner") denying his claim for disability insurance benefits
and a period of disability under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, as well
as his claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §
1382(a)(3).

## PROCEDURAL HISTORY

On November 20, 2009, Sibley submitted applications for benefits.  He reported that he
became unable to work on September 9, 2009.  R. 92-97.  He related issues with his mental health,
depression, problems coping with life, and speech difficulties as a result of a broken jaw.  R. 156.
On March 18, 2010, his claim for benefits was denied.  R. 48-51.  On September 7, 2010, there was
a hearing before an Administrative Law Judge ("ALJ").  R. 27-44.  On September 15, 2010, the ALJ
issued an unfavorable decision.  R. 10-22.  On January 10, 2011, the Appeals Council denied
Sibley's request for review.  R. 1-3.  On February 14, 2011, he filed a complaint in federal court.

Rec. doc. 1.  The matter was submitted on cross-motions for summary judgment.  Rec. docs. 12 and

15.

## STATEMENT OF ISSUES ON APPEAL

1.      Did the ALJ err by failing to find that Sibley's psychotic impairment was a severe
        impairment?

2.      Did the ALJ err in the consideration of the mental residual functional capacity questionnaire
        completed by Dr. Ahmed?

## THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUES ON APPEAL

        The ALJ made the following findings relevant to the issues on appeal:

1.      Sibley met the insured status requirements of the Act through September 30, 2013.

2.      Sibley had not engaged in substantial gainful activity since July 31, 2009, the alleged onset
        date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      Sibley had the following severe impairment:  personality disorder (20 CFR 404.1520(c) and
        416.920(c)).

4.      Sibley did not have an impairment or combination of impairments that met or medically
        equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR
        404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      Sibley had the residual functional capacity to perform a full range of work at all exertional
        levels but with the following nonexertional limitations: the claimant was limited to unskilled
        work with no more than occasional contact with the general public and coworkers.

6.      Sibley was capable of performing past relevant work as a vehicle washer and janitor.  This
        work did not require the performance of work related activities precluded by Sibley's
        residual functional capacity (20 CFR 404.1565 and 416.965).

7.      Sibley was not under a disability, as defined in the Act, from July 31, 2009, through the date
        of the decision (20 CFR 404.1520(f) and 416.920(f)).

R. 15-21.

## ANALYSIS

a.    **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. Id. §§ 404.1520, 416.920; Perez v. Barnhart, 415 F.3d at 461; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1] The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

---

[1] The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520©, 416.920©.

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

The claimant has the burden of proof under the first four parts of the inquiry. Id. If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant." Id.; accord Selders, 914 F.2d at 618.

"In determining whether substantial evidence of disability exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history." Perez v. Barnhart, 415 F.3d at 462. "The Commissioner, rather than the courts, must resolve conflicts in the evidence." Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

b.    **Testimony at the Hearing.**

Sibley was forty at the time of the hearing. R. 33. He completed the twelfth grade and received a diploma. R. 33. He was in special education for all of his classes. R. 33. He lived with his girlfriend. R. 32. His daughter and granddaughter also lived in the house with him. The daughter had other children that came in and out. R. 35.

Sibley's last employment was with Burger King where he cleaned the floors and the bathrooms. R. 31 and 37. He stopped working in September 2009 because his medication made him weak and dizzy and he heard voices telling him to hurt people. R. 31. Burger King was going to lay him off because he could not be around a lot of people. R. 31. Before Burger King, he worked at Elmer's Candy Company for about a month stacking boxes. R. 37-38.

Sibley took medication for the voices and his nerves.  R. 31.  After he took the medication he was very weak.  R. 33.  When he did not take the medication, the voices started again.  R. 34.  He went to a mental health clinic and talked to the doctor about the voices.  R. 34.  He had trouble sleeping but the condition improved with medication.  R. 34.  A couple of months before the hearing, he thought about killing himself.  R. 36.  His medication was changed and he felt better.  R. 36.

During the day Sibley went with his girlfriend to her employment so he could be away from home.  He sat in a truck all day to be away from people.  R. 35.  He enjoyed playing a game and he watched TV.  R. 37.  He tried to wash dishes and weed the grass but he became very dizzy.  R. 33.  He did not go the grocery store or do any cooking.  R. 37.  He did not go to church.  He did not visit people.  He did not get along with his co-workers at Burger King.  The voices told him they were trying to hurt him.  R. 35.

Sibley's jaw was injured when someone hit him with an iron pipe and stole his money.  R. 36.  All of his food was blended because of his jaw.  R. 32.  He was unable to return to Earl K. Long Hospital for treatment on his jaw because he lacked the transportation.  R. 32.

Sibley learned someone was using his Social Security number when he applied for benefits.  R. 38.  On March 12, 2010, he filed a report of identity theft with the Sheriff's Office for Tangipahoa Parish.  R. 39 and 286-87.

In 1988, Sibley was hospitalized for cocaine use.  Since then he did not have any difficulties with drugs or alcohol.  R. 41.

The vocational expert testified and classified his prior work cleaning trucks as medium and semi-skilled and his work with Burger King as medium/heavy and unskilled.  R. 41.  Based on the

ALJ's hypothetical questions, Sibley could perform all of his past work. R. 42. If it was expected that Sibley might engage in violence or make threats of violence toward his co-workers or members of the general public, he could not maintain employment. R. 42. If Sibley had limitations on accepting instructions and other limitations as described by his counsel, he would not be able to maintain employment. R. 44.

c. **Medical Evidence**.

In 2007, Sibley was treated at the Rosenblum Mental Health Center ("RMH") on a referral from Ochsner Psychiatric Hospital. R. 233.

On July 26, 2009, Sibley was hit in the face with a pipe. R. 206. He went to the emergency room at the North Oaks Medical Center in Hammond. R. 207. He complained of pain, loose teeth, and difficultly opening his mouth and eating. There was swelling. R. 207. On July 28, 2009, he returned to the emergency room. X-rays revealed a minimally displaced fracture. R. 213. He was referred for oral surgery. Pain medication was prescribed. R. 209. On July 29, 2009, he went to the emergency room at Earl K. Long Hospital, r. 219 and he was admitted to the hospital for surgery. R. 220. On July 31, 2009, there was an open reduction and internal fixation of one fracture and a closed reduction of the other fracture. R. 230. Sibley was stable at his discharge. R. 227-28.

On August 7, 2009, there was no swelling and no sign of infection. R. 217. On August 21, 2009, he complained of pain. Medication was prescribed. He was to return in two weeks. R. 216. On September 4, 2009, he reported pain following an accident when a co-worker bumped his chin. R. 215. X-rays showed that his teeth were wired shut. R. 224. X-rays taken on September 18, 2009 revealed that all fragments were in position. R. 223.

On November 2, 2009, Sibley returned to RMH and reported thoughts of suicide and hearing voices telling him to kill people. R. 233. He reported that he was off of his medication because of the injury to his jaw. He lost his job at Burger King because the injury made him sensitive to cold. It hurt when he went into the freezer at Burger King. He applied for disability benefits. R. 233. He had a history of schizophrenic-like symptoms and psychotic depression. It was unclear as to his clean time and sobriety. Because of his insomnia and pain, Elavil was prescribed. Risperdal was to be added if the voices continued. A further visit was scheduled in ten days, and he was scheduled for therapy. R. 233.

On November 13, 2009, Sibley attended therapy at RMH and participated in an orientation group. R. 235.

On December 1, 2009, he canceled an appointment. R. 234. On December 4, 2009, he reported to RMH that the medication was working and he was sleeping. R. 237.

On January 4, 2010, he reported to a doctor at RMH that he had difficulty sleeping and increased problems with the voices telling him to hurt other people. He realized that the voices were not real. The dosage of his medication was increased. R. 239-40.

On January 16, 2010, Sibley went to the emergency room at Lallie Kemp hospital and reported pain in his mouth at the site of the surgery. R. 242. On January 18, 2009, he returned to the emergency room for pain in his mouth. R. 244. Ultram was prescribed. R. 246.

On February 1, 2010, he attended therapy at RMH. It was noted that he reported that he was doing "okay" since his last visit, he continued to be bothered by the voices, he denied thoughts of suicide, his sleeping had improved, and there was pain from the injury and surgery on his jaw. R. 249.

On March 2, 2010, Sibley returned to therapy at RMH. He reported to a social worker that he was doing poorly since his last visit and the increased medication helped for a only few days. R. 298. He was seen by M.L. Ahmed, M.D., who noted that Sibley said the medication was not helping, he heard the voice of his dead grandmother telling him to do things, he was very tearful during the interview, and he thought that people wanted to harm him. The medication was changed. R. 296.

On March 8, 2010, Sandra B Durdin, Ph.D., a consulting clinical psychologist, completed a psychological evaluation.[2] The behavioral observations included:

> He never at any time looked as if he were responding to internal stimuli. Mr. Sibley's presentation of symptoms and his performance on cognitive testing were not credible. He malingered. The information he provided cannot be viewed as reliable.

R. 253. In describing the results, Dr. Durdin stated that, "[h]is overall cognitive skills could not be properly assessed because of malingering." R. 255. The conclusions contain the following:

> Mr. Sibley's ability to understand, remember and carry out simple instructions and familiar detailed instructions is adequate. His ability to maintain attention to perform simple repetitive tasks for two hour blocks of time is adequate. His ability to sustain effort and persist at a normal pace over the course of a forty hour week is adequate. His ability to relate to others, including supervisors and co-workers is fair. He has antisocial personality traits. His ability to tolerate the stress and pressure associated with day-to-day work activity and demands is adequate. He is capable of managing his personal financial affairs if sober. He is not drug screened and would not state last use.

---

[2] On January 26, 2010, Joseph Kahler, Ph.D., completed a case analysis form with the following:

Claimant has a history of presenting with unrealistic symptom clusters. Please send him for PSCE, preferably to Dr. Durdin, who performed the PSCE on him on 4/16/07. That way, we can have some continuity in observations of his mental status verus malingering.

R. 247.

R. 255. On March 17, 2010, Judith Levy, Ph.D., a non-examining clinical psychologist, reported that there was insufficient evidence to complete a psychiatric review technique form. R. 258. Dr. Levy cited Dr. Durdin's notes. R. 270.

On March 26, 2010, Sibley returned to Dr. Ahmed. He reported that the medication was helping him, he was not hearing voices, his depression was better, and he had no thoughts of suicide. R. 296.

On April 13, 2010, Sibley reported that he was doing much better and his medication was very helpful. R. 295. Dr. Ahmed noted that Sibley was stable on his medication. R. 294.

On May 6, 2010, Sibley reported that he was doing fine. R. 293.

On May 11, 2010, Dr. Ahmed completed a mental residual functional capacity form. R. 280-84. Regarding social interaction, Dr. Ahmed found that Sibley possessed a marked degree of impairment in three categories and a moderate degree of impairment in one. His conclusions would not change if only minimal contact or interaction with others was required. R. 280-81. For sustained concentration and persistence, Dr. Ahmed found a marked degree of impairment for four categories and a moderate degree for the other four. R. 281-82. Regarding adaption, there were four categories with a marked degree of impairment, two with a moderate degree of impairment and one with a mild degree of impairment. Sibley's condition was likely to deteriorate under stress. He was not capable of managing his own funds. The impairment met the duration requirement. Alcohol or drug addiction were not confirmed. Dr. Ahmed commented that Sibley reported that whenever he tried to work, he did not get along with his co-workers. This led to fights and the termination of his employment. R. 283.

On June 7, 2010, Sibley reported to RMH that he was doing "okay" since his last visit, but he continued to have medical problems which depressed him.  R. 292.

On July 9, 2010, Sibley returned to RMH and reported that he was doing "okay," he forgot to take his medication, there were a few days where he heard voices, and he complained of problems with his jaw.  R. 291.

On August 6, 2010, Sibley reported to RMH that he was taking his medication, he denied any thoughts of suicide, he was not hearing voices, he continued to have medical problems with his jaw, he did not have any problems sleeping or with his appetite, his nerves were "okay," and he liked to keep to himself.  R. 290.

On August 18, 2010, a clinician at RMH completed an evaluation report and recommended low intensity community based services.  R. 289.

d.      **Plaintiff's Appeal.**

Issue No. 1.      Did the ALJ err by failing to find that Sibley's psychotic impairment was a severe impairment?

Sibley argues that: (1) the evidence establishes that he suffered from a psychotic disorder which had more than a minimal effect on his ability to do work; and (2) the failure to find that he had psychotic disorder which was a severe impairment was error; and (3) the error requires reversal of the decision.

At step two the ALJ found that Sibley had one severe impairment, personality disorder.  He did not find that he had a second severe impairment.  R. 15.  In describing the medical evidence, the ALJ did note that Sibley was diagnosed with psychotic disorder.  R. 18.

In support of the presence of the psychotic disorder, Sibley cites the psychiatric evaluation of November 2, 2009.  R. 233.  The Commissioner responds that evaluation is not attributed to an

acceptable medical source. <u>See</u> 20 C.F.R. §§ 404.1513(a), 416.913(a) (defining "acceptable medical sources" as licensed physicians or psychologists). The Commissioner reads the record too narrowly. R. 233 is the first page of a psychological evaluation from RMH. It states "I am prescribing a moderate dose of generic Elavil, will add Risperdal if the voices continue. . . ." R. 233. The page is not signed. Nor is there a second page with a signature of a psychiatrist. R. 232 is a medication order sheet from RMH for Sibley. It reveals that on November 2, 2009, the same date as the psychiatric evaluation, A. J. Arretteig, M.D. prescribed Amitriptyline.[3] The medication order sheet is signed by Dr. Arretteig. It is clear that on November 2, 2009, Dr. Arretteig diagnosed Sibley with "psychosis NOS." Rec. doc. 232. The ALJ erred in not finding that Sibley had an additional severe impairment: psychotic disorder NOS.

The finding that the ALJ erred does not end the inquiry. It is necessary to determine whether the error was harmless. <u>Audler v. Astrue</u>, 501 F.3d 446, 448 (5th Cir. 2007). The ALJ's evaluation proceeded to the fifth step. "[I]f the ALJ proceeds past the impairment step in the sequential evaluation process the court must infer that a severe impairment was found." <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir. 1988). In <u>Mays</u>, the ALJ reached the fifth step. The court concluded that the ALJ implicitly found a severe impairment and therefore found no error when the ALJ did not explicitly find a severe impairment. <u>Id</u>. The ALJ reached the fifth step in the evaluation of Sibley's claim, finding that Sibley had one severe impairment. The failure to find that he had a second severe impairment was harmless error.

---

[3] A brand name for Amitriptyline is Elavil. www.nlm.nih.gov.

<u>Issue No. 2</u>.     Did the ALJ err in the consideration of the mental residual functional capacity questionnaire completed by Dr. Ahmed?

The ALJ found that Sibley's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible.  R. 18.  He described Sibley's treatment at RMH from November 2, 2009 through February 1, 2009, including reports of improvement in his condition after changes in his medication.  R. 18.  Dr. Durdin's evaluation was described.  R. 18-19.  The mental residual functional capacity form completed by Dr. Ahmed on May 11, 2010 was reviewed.  R. 19.

The ALJ referred to Social Security Ruling 96-2p, 1996 WL 362211 (F. R.), regarding giving controlling weight to treating source medical opinions and described the circumstances when a treating source's medical opinion is not given controlling weight.  R. 20.  He did not accord controlling weight to Dr. Ahmed's opinion because: (1) Sibley was never hospitalized for his impairment; (2) after April 2010, his condition improved with the consistent use of medication and was controlled through his current medication usage; (3) the medical evidence did not support the claimed limitations; (4) Dr. Ahmed did not identify any records supporting the check marks on the form; (5) Dr. Ahmed's assessment was based upon Sibley's subjective opinions and feelings rather than objective findings; and (6) Dr. Ahmed did not complete a mental status examination specifying any limitations caused by the Sibley's impairments.  R. 21.  The ALJ concluded that, "the 'opinions' asserted in the checklist completed by Dr. Ahmed are not consistent with the preponderant medical and non-medical evidence. . . ."  R. 20.  He gave great weight to the opinion of Dr. Durdin.  <u>Id</u>.  He added that: (1) Dr. Ahmed's opinion was inconsistent and contradicted by Dr. Durdin's report, by Sibley's ability to earn substantial amounts before his incarceration, and other medical evidence; (2) the limitations imposed by Dr. Ahmed were not supported by the progress notes; and (3) Dr. Ahmed did not regularly treat Sibley.  R. 20.

Sibley contends that the ALJ's decision is contrary to the legal standards requiring great deference to the opinions of treating physicians. He urges that Dr. Ahmed was his treating physician and his opinion must be given controlling weight because it is well supported by medically acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence. <u>See</u> <u>Newton</u>, 209 F.3d at 455 and SSR 96-2p. He argues that there is no other substantial evidence of record that contradicts or conflicts with the opinion. Even if Dr. Ahmed's opinion does not meet the controlling weight test, Sibley urges that it must be weighed against Dr. Durdin's opinion under the factors enumerated in <u>Newton</u>. He contends that, pursuant to <u>Newton</u>, the ALJ may discount Dr. Ahmed's opinion only if: (1) the opinion is conclusory; (2) it is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques; or (3) it is otherwise unsupported by the evidence. 209 F.3d at 456. He argues that: (1) the ALJ must accord greater weight to the opinion of the doctor who had the greater opportunity to observe and know the patient as an individual; (2) the opinion of a specialist is accorded greater weight than a non-specialist; and (3) the ALJ must provide an explanation for the weight accorded to Dr. Ahmed's opinion.

Sibley contends that the ALJ committed the following errors: (1) he improperly accorded no weight to Dr. Ahmed's opinion after determining that it did not meet the test for controlling weight; (2) he failed to explain the weight accorded Dr. Durdin; and (3) his explanation for denying controlling weight to Dr. Ahmed's opinion is contrary to the legal standards and is not supported by substantial evidence. He urges that: (1) the finding concerning medication dosage was a medical finding which is not permitted; (2) Dr. Ahmed's opinion was corroborated by the medical professionals who interacted with Sibley, including two medical doctors and a social worker; (3) the

ALJ's contention that Dr. Ahmed's opinion is based upon subjective opinions and feelings was improper because Dr. Ahmed is a psychiatrist and the ALJ substituted his lay opinion for Dr. Ahmed's opinion; (4) the ALJ's reference to Sibley's improvement with medication is inconsistent with the evidence and does not account for side effects; (5) Dr. Durdin's opinion is not supported by the medical record; and (6) the ALJ did not employ Dr. Durdin's limitations in determining Sibley's ability to work.

The Commissioner responds that there was good cause for the ALJ to reject the opinion of Dr. Ahmed.[4] There is good cause for disregarding a physician's opinion when: (1) the statements are brief and conclusory; (2) they are not supported by medically acceptable clinical laboratory diagnostic techniques; or (3) they are otherwise unsupported by the evidence. Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994), and Newton, 209 F.3d at 456. The Commissioner contends that Dr. Ahmed's statements are brief and conclusory because: (1) he checked off the degrees of impairment on a form; (2) the completed form contains no reference to clinical findings; (3) the only written explanation for the limitations is Sibley's report is that whenever he tried to work he did not get along with his co-workers. The Commissioner argues that Dr. Ahmed's opinion is not supported by medically acceptable clinical laboratory diagnostic techniques because: (1) there is no evidence that Dr. Ahmed performed a clinical evaluation; (2) there are only three notes by Dr. Ahmed over a two month period; (3) there are no medical findings in his notes; and (4) these consultations were

---

[4] The Commissioner does not agree with Sibley's description of Dr. Ahmed as his treating physician. The Commissioner contends that Dr. Ahmed lacked the necessary continuing treatment relationship. The Commissioner agrees, however, that the good cause requirement is equally applicable to treating and examining physicians. Rec. doc. 15, n. 2 at 8.

for the purpose of prescribing medications.[5] The Commissioner contends that Dr. Ahmed's opinion is not supported by the evidence, because his notes reveal that Sibley's medication was effective. The Commissioner argues that Dr. Ahmed's opinion is contradicted by Dr. Durdin's examination report and this provides good cause for rejecting Dr. Ahmed's opinion.

In <u>Scott v. Heckler</u>, 770 F.2d 482, 485 (5th Cir. 1985), the ALJ rejected the treating physician's opinion that the claimant was totally disabled. In reversing and remanding the Fifth Circuit said:

> This court has repeatedly held that ordinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability. There are exceptions to this principle. The ALJ may give less weight to a treating physician's opinion when "there is good cause shown to the contrary," as is the case when his statement as to disability is "so brief and conclusory that it lacks strong persuasive weight," is not supported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence. The ALJ may also reject a treating physician's opinion if he finds, with support in the record, that the physician is not credible and is "leaning over backwards to support the application for disability benefits." The administrative fact finder is entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions and testimony accordingly. 770 F.2d at 485

In <u>Newton</u>, the ALJ rejected the opinion of the claimant's treating physician that the claimant could not perform any sedentary work. The Fifth Circuit reversed the decision of the ALJ and remanded for the purpose of requiring the ALJ to perform the analysis required by the SSR 96-2p before rejecting the treating physician's opinion.

> The Court concludes that, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed

---

[5] The first note by Dr. Ahmed for Sibley is March 2, 2010. R. 296. The second note is March 26, 2010. R. 296. The third note is for April 13, 2010. R. 295. The mental residual functional capacity form was completed on May 11, 2010 (R. 283), but there is no evidence that Dr. Ahmed saw Sibley on that day. There are no further notes by Dr. Ahmed.

analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2). Additionally, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, <u>absent other medical opinion evidence based on personal examination or treatment of the claimant</u>, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

<u>Newton</u>, 209 F.3d at 453 (emphasis added).

In <u>Newton</u>, the claimant was diagnosed with systemic lupus erythematosus in September 1989 by Dr. Pertusi, a rheumatologist. The claimant sought benefits three years and three months later. During this period the claimant sought ER treatment on nine occasions and was admitted to a hospital on four occasions. The claimant was examined and treated by Dr. Pertusi frequently throughout this period. <u>Id</u>. at 452. Dr. Pertusi submitted an assessment with limitations. For example, the claimant could stand or walk less than two hours per regular work day. <u>Id</u>. at 453. At the hearing there was testimony from a medical expert <u>who had not examined or treated the claimant</u>, but who reviewed the medical records. The ALJ rejected Dr. Pertusi's opinion and relied on the medical expert. The Fifth Circuit reversed and stated:

> This is not a case where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another. *See and compare, e.g., Spellman v. Shalala,* 1 F.3d 357 (5th Cir.1993). Nor is this a case where the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion. *See and compare, e.g., Prosch v. Apfel,* 201 F.3d 1010 (8th Cir.2000). Instead, this is a case where the ALJ summarily rejected the opinions of Newton's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant.

<u>Id</u>. at 458.

The record does not support Sibley's contention that Dr. Ahmed was a treating specialist. On March 2, 2010, Sibley was seen at RMH by Laurie Scherr, a social worker. Sibley reported to Scherr that: (1) he was doing poorly since his last visit (February 1, 2010 - R. 249); (2) the increased

medication helped for a few days but then his condition became worse; (3) the voices were driving him crazy; (4) he was worried that people were trying to hurt him; (5) the voices urged him to do evil things; and (6) he denied thoughts of suicide at the time of the visit but did have such thoughts at times. R. 298. Sherr asked the doctor to speak with Sibley. R. 298. On that same date, Sibley was seen by Dr. Ahmed for the first time. He told Dr. Ahmed that the medication was not working. Dr. Ahmed changed the medication. R. 298. Six days later, Sibley was seen by Dr. Durdin for a psychological evaluation. R. 253-255.

On March 26, 2010, he returned to Dr. Ahmed for his second contact with him. He reported that the medication was helping him, he was not hearing voices, his depression was better, and he had no thoughts of suicide. R. 296. On April 13, 2010, Sibley returned to Scherr. Sibley reported that he was doing much better and his medication was very helpful. He denied thoughts of suicide. He did not like to be around crowds but could handle it better than before. He was able to think more clearly. R. 295. On that day, he was seen by Dr. Ahmed, who noted that he was stable on the medication. There was no paranoia. R. 294. This was Dr. Ahmed's third and final contact with Sibley.

The record reflects that Dr. Ahmed saw Sibley only three times over the course of forty-three days. He did not perform a mental status examination. He did not examine and treat Sibley frequently over an extended period as did Dr. Pertusi. Assuming *arguendo*, that Dr. Ahmed was a treating specialist, there was other medical opinion evidence based on personal examination of Sibley. This was Sibley's second application for benefits. On April 16, 2007, Dr. Durdin performed a psychological evaluation on Sibley. The Commissioner sent him to Dr. Durdin in 2010, so there could be some continuity in the observations of his mental status. R. 247. Unlike <u>Newton</u>, there

was other medical evidence based on personal examination, which contradicted the form completed by Dr. Ahmed on May 11, 2010. Because there was reliable medical evidence from an examining psychologist controverting Dr. Ahmed's opinion, the ALJ was permitted to reject it without performing the detailed analysis under the criteria set forth in 20 C.F.R. § 404.1527(d)(2). The ALJ's opinion is not contrary to the legal standards requiring great deference to the opinions of treating physicians.

The ALJ's decision is supported by substantial evidence. For example, the ALJ found that Sibley's impairment was controlled through his current medication and his condition improved with medication. R. 20. Sibley responds that this is a medical finding which the ALJ was not permitted to make. Rec. doc. 12 at 19. Sibley also responds that the ALJ's finding was "inconsistent with the evidence of record, which show changes in medications and dosage adjustments, and fails to account for medication side effects." Id. at 20. Sibley does not describe these side effects.

The medical evidence demonstrates that Sibley was treated at RMH in 2007. There is no further evidence of treatment at RMH until November 2, 2009, about three months after he was assaulted with a pipe and the surgery on his jaw. Sibley reported thoughts of suicide and hearing voices. He was off of his medication. Dr. Arretteig prescribed medication. R. 232-33. He was seen at RMH on November 13 and December 1, 2009, January 4 and 16, 2010, and February 1, 2010. R. 235, 237, 239-40 and 249.

On March 2, 2010, he was seen by Scherr and Dr. Ahmed. Sibley told Scherr that the medication helped for a few days but things got worse. R. 298. Dr. Ahmed changed the medication. R. 297. On March 26, Dr. Ahmed noted that Sibley reported that the medication was helping him, he was not hearing voices, and his depression was better. R. 296. There is no mention of side

effects. On April 13, 2010, Sibley reported to Scherr that he was doing much better and the medication was very helpful in treating his symptoms. There is no reference to side effects. R. 295. Dr. Ahmed's note for the same day states that Sibley "is currently stable on his meds." R. 294.

Sibley was seen at RMH by Scherr on May 6, June 7, July 9 and August 6, 2010. R. 290-93. On August 6, Sibley reported to Scherr that he was taking his medication. He denied any thoughts of suicide, he was not hearing voices, he continued to have medical problems with his jaw, he did not have any problems sleeping or with his appetite, his nerves were "okay," and he liked to keep to himself. R. 290. This was the last record of a visit by Sibley to RMH.

There is substantial evidence for the ALJ's finding that Sibley's impairment was controlled by his current medication. The medical records reveal changes in the medication and dosage adjustments, but by April 13, 2010, the last visit with Dr. Ahmed, it was noted that Sibley was stable on the last prescribed medication.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that defendant's cross-motion for summary judgment (Rec. doc. 15) be GRANTED and plaintiff's motion for summary judgment (Rec. doc. 12) be DENIED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from

a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 15th day of December, 2011.

**SALLY SHUSHAN**
**United States Magistrate Judge**